HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JEFF OLBERG, an individual, CECILIA ANA PALAO-VARGAS, an individual, MICHAEL CLOTHIER, an individual, and JACOB THOMPSON, and individual, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>ALLSTATE INSURANCE COMPANY, an Illinois Corporation and ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, an Illinois Corporation, and CCC INFORMATION SERVICES INCORPORATED, a Delaware Corporation,<br><br>    Defendants. | No. 18-cv-00573<br><br>THIRD AMENDED COMPLAINT<br><br>JURY DEMAND |



# TABLE OF CONTENTS

**Page**

I.  NATURE OF THE CASE ............................................................................... 1

II.  JURISDICTION ......................................................................................... 4

III.  VENUE ..................................................................................................... 4

IV.  PARTIES ................................................................................................... 4

V.  FACTUAL ALLEGATIONS ....................................................................... 5

    A.  Allstate obtains and relies on manipulated data provided by CCC to underpay total loss claims. ................................................................. 5

    B.  Allstate underpaid the total loss claims of Plaintiffs. ........................... 11

VI.  CLASS ACTION ALLEGATIONS ............................................................. 19

FIRST CAUSE OF ACTION  (BREACH OF CONTRACT AGAINST ALLSTATE) .............. 21

SECOND CAUSE OF ACTION (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALLSTATE) ................................................ 22

THIRD CAUSE OF ACTION (CONSUMER PROTECTION ACT—VIOLATION OF WASH. REV. CODE § 19.86.020 AGAINST ALL DEFENDANTS) .......................................... 23

FOURTH CAUSE OF ACTION (CIVIL CONSPIRACY AGAINST ALL DEFENDANTS) .... 24

FIFTH CAUSE OF ACTION (DECLARATORY AND INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS) ......................................................................................................... 25

PRAYER FOR RELIEF ............................................................................................. 26

JURY DEMAND ....................................................................................................... 26



## I.   NATURE OF THE CASE

1.      When a person's vehicle is totaled in an accident, an automobile insurance company must not underpay claims by manipulating the data used to value the vehicle to underpay claims. Specifically, Washington law requires insurance companies to ensure that the value of the loss vehicle is "representative of the actual cash value of a comparable motor vehicle in the principally garaged area."[1] "Actual cash value" is defined to mean "the fair market value of the loss vehicle immediately prior to the loss."[2] Fair market value is generally defined along these lines: "The price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Treasury Regulation §1.170A-1(c)(2)

2.      Washington law prohibits insurance companies from valuing a total loss vehicle based on market prices of vehicles that are not comparable to the loss vehicle in manufacture and distribution. This includes using salvage and gray market vehicles to value a loss vehicle that is neither a salvage title nor a gray market vehicle. Comparing the loss vehicle to salvage vehicles implies the loss vehicle was a total loss immediately *before* the incident.[3] Gray market vehicles are manufactured for markets outside the U.S. and are therefore not comparable to vehicles made for the U.S. market.

3.      The Defendants work in concert to ensure total loss vehicles are undervalued and thus, underpaid. Defendant CCC Information Services ("CCC") knowingly and intentionally uses salvage titles and gray market vehicles as comparable vehicles to value the total loss vehicle and Defendants Allstate Insurance Company and Allstate Fire and Casualty Company ("Allstate") rely on these deflated values to settle claims. Washington law also prohibits insurance companies from reducing the claim values of total-loss vehicles with arbitrary, unexplained, and unjustified adjustments to the condition of comparable vehicles used to value

---

[1] *See e.g.* Wash. Admin. Code 284-30-320, 391.

[2] Wash. Admin. Code 284-30-320.

[3] *Id.*

THIRD AMENDED COMPLAINT - 1
Case No. 18-cv-00573
010743-12/1331903 V1

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

the loss vehicle, bearing no relation to actual cash value.[4] An insurer also must not misstate or conceal material facts that bear upon its estimate of value.

4. Likewise, companies that sell valuation data to the insurers must not base valuations on market prices of vehicles previously declared total losses. These companies must also not make arbitrary, unexplained, and unjustified adjustments to comparable vehicles used in the valuation. Such companies must ensure that they provide accurate and reliable vehicle values to insurers that pay total loss claims.

5. In negotiating and settling total loss claims, Allstate and CCC (collectively, "Defendants"), flagrantly violate these rules.

6. First, when CCC selects vehicles to compare with loss vehicles insured by Allstate, it includes salvage vehicles—vehicles previously damaged beyond what is economically viable to repair. Salvage vehicles are not comparable to the loss vehicle and are worth less due to their salvage status. Washington law requires the insurer to determine what the value of the loss vehicle was *before* being totaled, not to value it by comparing it to a vehicle *already* totaled. Allstate works in tandem with CCC to misrepresent the salvage vehicles as comparable to the loss vehicle while failing to disclose their salvage status, deceiving consumers and cheating them on their claims.

7. Second, when CCC selects vehicles to compare with loss vehicles insured by Allstate, it includes other types of vehicles that are not comparable to the loss vehicle, including gray market vehicles—vehicles manufactured for consumers in foreign countries and imported into the U.S.—that are not comparable to the loss vehicle and are worth less due to their gray market status. Allstate works in tandem with CCC to misrepresent the gray market vehicles as comparable in price while failing to disclose their gray market status, deceiving consumers and cheating them on their claims.

8. Third, when CCC produces valuation reports for Allstate total loss claims, it reduces the value of comparable vehicles by an arbitrary amount that it deems a "condition

---

[4] *See id.*

THIRD AMENDED COMPLAINT - 2
Case No. 18-cv-00573
010743-12/1331903 V1

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

adjustment" without itemizing or explaining the basis for the adjustment as required by Washington law. Allstate and CCC apply a uniform "condition adjustment" to multiple comparable vehicles involved in a valuation without even distinguishing one vehicle from the next. These arbitrary and unjustified condition adjustments artificially and improperly reduce claim payments by hundreds or thousands of dollars.

9. Allstate is an insurance company bound to process claims fairly and make its insureds whole after an accident. Allstate's systematic under-valuations and underpayments violate its insurance contracts as well as Washington regulations[5] governing the adjustment of total loss claims. Allstate's actions also violate Washington prohibitions on consumer deception and settling insurance claims in bad faith.

10. CCC represents that it is a "leading provider" of "big data insights" to the insurance industry. CCC provides vehicle valuations to the insurance industry, CCC provides vehicle valuations to Allstate for paying total loss vehicle claims. CCC unlawfully conspires with Allstate to undervalue total loss claims and acts contrary to law, including total loss regulations WAC 284-30-320 and 391, by furnishing valuation reports that (1) list salvage and gray market vehicles as comparable to the loss vehicle when they are not, and (2) contain arbitrary and unexplained condition adjustments to the values of comparable vehicles.

11. Plaintiffs bring this class action on behalf of all those insured under automobile insurance policies issued in the State of Washington by Allstate Insurance Company and Allstate Fire and Casualty Company whose claim valuations were provided by CCC Information Services Inc. and contained either (1) salvage or gray market vehicles listed as comparable vehicles, and/or (2) values of comparable vehicles reduced by artificial, unexplained "condition adjustments."

12. Plaintiffs seek for themselves and the class compensatory damages, treble damages, and attorney's fees, as well as declaratory and injunctive relief.

---

[5] *Id.*

THIRD AMENDED COMPLAINT - 3
Case No. 18-cv-00573
010743-12/1331903 V1

**HB HAGENS BERMAN**

## II.    JURISDICTION

13.    This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. Plaintiffs are citizens of Washington and Allstate is a citizen of Illinois (where it is incorporated and has its principal place of business) and CCC is a citizen of Delaware (where it is incorporated and has its principal place of business in Illinois).

14.    This Court has personal jurisdiction over Allstate Insurance Company because Allstate Insurance Company is a corporation licensed and authorized to do business in Washington and has transacted business in King County, Washington. This Court has personal jurisdiction over Allstate Fire and Casualty Insurance Company because Allstate Fire and Casualty Insurance Company is a corporation licensed and authorized to do business in Washington and has transacted business in King County, Washington. This Court has personal jurisdiction over CCC because CCC has purposefully directed its activities toward Washington by contracting to provide valuation services to insurance carries in Washington for use in settling and underpaying total loss claims of Washington insureds. This Court has personal jurisdiction over Plaintiffs because Plaintiffs consent to this Court's jurisdiction.

### III.    VENUE

15.    Venue is proper in this District under 28 U.S.C. § 1391 because this is the District in which Plaintiffs' insurance benefits were denied and the cause of action arose.

### IV.    PARTIES

16.    Plaintiffs Jeff Olberg, Cecilia Ana Palao-Vargas, Michael Clothier, and Jacob Thompson were at all relevant times residents of the State of Washington.

17.    At all times pertinent, Plaintiff Jeff Olberg was insured under a policy of automobile insurance with Allstate Insurance Company that included coverage for the total loss of a vehicle.

18.    At all times pertinent, Plaintiff Cecilia Ana Palao-Vargas was insured under a

THIRD AMENDED COMPLAINT - 4
Case No. 18-cv-00573
010743-12/1331903 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

policy of automobile insurance with Allstate Fire and Casualty Insurance Company that included coverage for the total loss of a vehicle.

19.     At all times pertinent, Plaintiff Michael Clothier was insured under a policy of automobile insurance with Allstate Fire and Casualty Insurance Company that included coverage for the total loss of a vehicle.

20.     At all times pertinent, Plaintiff Jacob Thompson was insured under a policy of automobile insurance with Allstate Fire and Casualty Insurance Company that included coverage for the total loss of a vehicle.

21.     Allstate Insurance Company is an Illinois corporation with its principal place of business in Illinois.

22.     Allstate Insurance Company is an underwriting company wholly owned by the Allstate Corporation, a Delaware corporation.

23.     Allstate Fire and Casualty Insurance Company is an Illinois corporation with its principal place of business in Illinois.

24.     Allstate Fire and Casualty Insurance Company is also wholly owned by the Allstate Corporation.

25.     CCC is a Delaware corporation with its principal place of business in Illinois.

**V.     FACTUAL ALLEGATIONS**

**A.     Allstate obtains and relies on manipulated data provided by CCC to underpay total loss claims.**

26.     All allegations contained in previous paragraphs are incorporated herein by reference.

27.     Allstate Insurance Company and Allstate Fire and Casualty Company file a consolidated annual statement as members of The Allstate Insurance Group. The Allstate Insurance Group is the fourth-largest personal lines insurance company in the United States. Members of The Allstate Insurance Group, including Defendants, issue automobile insurance policies to consumers in the State of Washington.

28.     The Allstate Insurance Group is made up of two distinct "brands" the Allstate

THIRD AMENDED COMPLAINT - 5
Case No. 18-cv-00573
010743-12/1331903 V1

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Brand and the Esurance Brand. Allstate Insurance Company and Allstate Fire and Casualty Insurance Company are both a part of the Allstate Brand.

29.     The Allstate Brand touts itself as a reliable and trustworthy source of insurance coverage. In its advertising campaigns, the Allstate Brand has adopted the motto, "You're in good hands." On its website, the Allstate Brand claims, "In every aspect of our business, we strive to do the right thing—for our customers, our employees, our communities and our world." But when Allstate's customers' cars are wrecked in life-changing accidents, Allstate betrays these principles, playing games and putting profits ahead of people. Allstate conspires with CCC to fudge the numbers to shortchange vulnerable consumers, who are relying on Allstate to pay fair value so they can afford to buy a replacement.

30.     Defendants work in concert to create policies and infrastructure that cheat the insureds out of monies to which they are entitled. Under its agreement with Allstate, CCC provides Allstate with valuation reports that apply unjustified, explained, and unitemized condition adjustments to reduce the values of comparable vehicles used to value total loss claims. The valuation reports also utilize the prices of salvage and gray market vehicles to determine the price of the loss vehicle without disclosing their salvage and gray market status, even though salvage and gray market vehicles are inherently worth less than non-salvage and non-gray market vehicles.

31.     As wholly owned subsidiaries of the same company, Allstate Insurance Company and Allstate Fire and Casualty Insurance Company share a common corporate headquarters, file a combined annual report and tax return, and use valuation reports from CCC that are indistinguishable in form between the insurers, providing a uniform method of undervaluing total loss claims for Allstate insureds.

32.     Upon information and belief, Allstate follows a single set of guidelines, methods, and policies regarding the application of condition adjustments and the use of gray market vehicles to systemically undervalue total loss claims.

33.     Salvage vehicles are vehicles previously declared total losses, and their titles are branded with labels such as "salvage," "total loss," or "rebuilt" to advise all future owners that

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

the vehicle was so damaged as to be deemed uneconomical to repair. Under Washington law, "Salvage vehicle" is defined as follows:

> [A] vehicle whose certificate of title has been surrendered to the department under RCW 46.12.600 due to the vehicle's destruction or declaration as a total loss or for which there is documentation indicating that the vehicle has been declared salvage or has been damaged to the extent that the owner, an insurer, or other person acting on behalf of the owner, has determined that the cost of parts and labor plus the salvage value has made it uneconomical to repair the vehicle.

Wash. Rev. Code § 46.04.514.

34.     Such serious damage and any associated repairs in a vehicle's history impair its fair market value because, among other things, a reasonable buyer would question the safety and reliability of a vehicle already wrecked.

35.     Gray market vehicles are vehicles manufactured for markets outside the United States and later imported and offered for sale in the United States.

36.     Gray market vehicles are disfavored in the marketplace and generally less valuable than vehicles manufactured for the U.S. market. The prices of gray market vehicles are depressed for several reasons:

    a.   For a given year, make, and model, vehicles made for non-U.S. markets such as Canada have different safety and environmental specifications from vehicles made for the U.S. market and require modifications to comply with U.S. law;

    b.   Gray market vehicles frequently lack a clear chain of title, increasing the risk that the vehicle has been stolen;

    c.   Gray market vehicles are manufactured with an instrument panel and odometer that uses kilometers instead of miles, and the conversion from kilometers to miles creates a risk that the odometer has been manipulated;

    d.   The prices of vehicles are depressed by arbitrage. Because vehicle supply and demand varies and currency strength varies from one country to the next, the



cost of a gray market vehicle is often lower than a vehicle of the same year, make, and model made for and sold in the United States;

37.     For these reasons, a gray market vehicle is not "a comparable motor vehicle" for a vehicle of the same year, make, and model made for the U.S. market. Using gray market vehicles to calculate the value of the loss vehicle artificially reduces the valuation of the loss vehicle to benefit the insurer at the expense of the insured.

38.     Allstate's standard form automobile policy provides coverage for the total loss of a vehicle in an accident.

39.     For total loss claims, Allstate must base any cash settlement offer on the "actual cash value of a comparable motor vehicle." WASH. ADMIN. CODE § 284-30-391(2).

40.     In the event of a total loss, Allstate promises in its policy that it will pay the insured the "actual cash value" of the vehicle before the accident.

41.     For total loss claims, "'[c]omparable motor vehicle' means a vehicle that is the same make and model, of the same or newer model year, similar body style, with similar options and mileage as the loss vehicle and in similar overall condition, as established by current data. To achieve comparability, deductions or additions for options, mileage or condition may be made if they are itemized and appropriate in dollar amount." WASH. ADMIN. CODE § 284-30320(2).

42.     For total loss claims, Allstate must "[b]ase all offers on itemized and verifiable dollar amounts for vehicles that are currently available . . . using appropriate deductions or additions for options, mileage or condition when determining comparability." WASH. ADMIN. CODE § 284-30-391(4)(b).

43.     For total loss claims, "[a]ny additions or deductions from the actual cash value must be explained to the claimant and must be itemized showing specific dollar amounts." WASH. ADMIN. CODE § 284-30-391(5)(d). The purpose of this requirement is to ensure that any adjustments are reasonable and justified and to ensure that consumers have the ability to evaluate and challenge any deductions that are improper.

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

44.     CCC and Allstate have conspired to create a system whereby CCC artificially deflates the estimated value of the total loss vehicle enabling Allstate to offer and pay less than the actual cash value.

45.     Allstate also bases its offers and payments on manipulated valuation reports furnished by CCC that do not satisfy Washington law for two reasons. First, the valuations utilize the prices of salvage and gray market vehicles that are not comparable to the loss vehicle because of their salvage and gray market status, without making any countervailing adjustment in favor of the insured. Second, the valuations utilize arbitrary and unexplained "condition adjustments" to artificially reduce the values of comparable vehicles.

46.     CCC advertises itself as "a leading provider of innovative cloud, mobile, telematics, hyperscale technologies, and apps for the automotive insurance and collision repair industry." Its website states that "CCC's solutions and big data insights are delivered through the powerful CCC ONE platform, which connects a vast network of 350+ insurance companies, 24,000+ repair facilities, OEMS, hundreds of parts suppliers, and dozens of third-party data and service providers." CCC caters to the needs and demands of the insurance industry, stating its aim to "[t]rack claim process efficiencies and help ensure customers are happy and engaged."

47.     The website states, "CCC ONE Valuation offers accurate, verifiable total loss valuations." CCC promises to give insurers' customers "the confidence of knowing they're getting a vehicle valuation based on verifiable data." CCC says its services will "BOOST YOUR CUSTOMERS' CONFIDENCE" by making it "easer for you to explain the valuation to customers."

48.     CCC and Allstate collaborate in the creation of the valuation report for each total loss vehicle. Under the contracts between CCC and Allstate, Defendants agreed that CCC would provide vehicle valuations based on current market data for total loss claims as well as a written report with that data for each total loss vehicle. Allstate has contracted with CCC to furnish valuation reports to be used in the process of valuing total loss claims and adjusting the claims for insureds. Upon information and belief, Allstate conducted due diligence on CCC's methodology and/or knew or should have known before contracting that (1) CCC's use of

THIRD AMENDED COMPLAINT - 9
Case No. 18-cv-00573
010743-12/1331903 V1

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  salvage and gray market vehicle data did not comply with Washington law and would result in

2  deception, delays, and underpayments of motor vehicle total loss claims and (2) CCC's

3  application of condition adjustments to the values of comparable vehicles did not comply with

4  Washington law and would result in deception, delays, and underpayments of motor vehicle total

5  loss claims. Allstate contracted with CCC with the intention of relying upon CCC valuation

6  reports to value total loss claims, knowing that generally total loss claim payments that did not

7  involve a formal appraisal would be based upon the values stated in CCC valuation reports.

8      49.    For each claim, Allstate provides basic information about the loss vehicle and its

9  condition and configuration. CCC then populates the report with the sales prices of purportedly

10  comparable vehicles it identified that recently sold or were for sale in the geographic area of the

11  insured. The purportedly comparable vehicles include salvage and gray market vehicles, which

12  are usually not comparable to the insured's loss vehicle because they either have been previously

13  deemed a total loss or were manufactured for a foreign market. The report also contains

14  unitemized, unexplained, and unjustified downward condition adjustments to the values of

15  comparable vehicles. CCC takes an active role in collecting valuation data on comparable

16  vehicles and then reducing those valuations to serve the economic interests of the insurer. These

17  reports are arbitrary, unexplained, unjustified, unitemized, inconsistent, and contrary to

18  Washington law, as alleged throughout the Complaint.

19      50.    The reports contain a purported valuation for the loss vehicle based upon the data

20  in the report. Upon information and belief, Allstate verified the results of some or all of CCC's

21  valuations and at all relevant times knew or should have known that the application of

22  unitemized, unexplained, and unjustified condition adjustments to comparable vehicles violates

23  Washington law. Allstate also knew or should have known at all relevant times that basing

24  valuations on the prices of salvage and gray market vehicles that are not comparable to the

25  insured vehicle without a countervailing adjustment in favor of the insured does not comply with

26  Washington law. At all relevant times Allstate knew or should have known that the use of CCC's

27  valuations would result in deception, delays, and underpayments of motor vehicle total loss

28  claims.

THIRD AMENDED COMPLAINT - 10
Case No. 18-cv-00573
010743-12/1331903 V1

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

51.     Upon information and belief, CCC is aware that its total loss valuation method does not comply with Washington law. CCC designs its products and services to serve the needs of the insurance industry nationwide. It markets and documents its products and services for insurers on a state-specific basis. Washington's total loss regulations require an insurer to base valuations on the values of comparable motor vehicles, not the list prices of salvage and gray market vehicles, which are not comparable. Washington's total loss regulations, WAC 284-30-320 and - 391, also expressly require itemization and explanation of condition adjustments. But CCC furnishes the valuation reports to the Insurer Defendants anyway to further the economic interests of the Insurer Defendants at the expense of their insurance customers.

52.     Allstate offers each insured a claim settlement equivalent to the valuation amount found on the report.

53.     The valuation reports reduce the estimated values of comparable vehicles, citing a "condition adjustment," but fail to itemize or explain the basis for these condition adjustments. These condition adjustments are arbitrary and unjustified. Indeed, even though each comparable vehicle has unique characteristics, the reports reduce the value of multiple comparable vehicles by the same amount, down to the last dollar, without any itemization or explanation. These blind and arbitrary reductions bear no relation to the actual fair market value of the comparable vehicles or the loss vehicle. The application of an arbitrary condition adjustment to reduce the value of comparable vehicles artificially reduces the valuation of the loss vehicle to benefit the insurer at the expense of the insured.

54.     The valuation reports also—at least in part—base their calculations upon the values of salvage and gray market vehicles instead of vehicles that are comparable to the loss vehicle, without any countervailing adjustment in favor of the insured.

**B.      Allstate underpaid the total loss claims of Plaintiffs.**

55.     Plaintiffs each owned a vehicle which was involved in an accident and damaged so seriously as to be a total loss.

56.     Plaintiffs made claims with Allstate for the total loss of the vehicles. Allstate

1   provided written settlement offers to each plaintiff.

2          57.     CCC furnished a valuation report to Allstate to be used in adjusting the claim for

3   the value of the vehicle, in accordance with its contract with Allstate. Allstate based each

4   settlement offer upon the valuation report obtained from CCC.

5          58.     Plaintiff Jeff Olberg was the owner of a 2013 Ford Fusion Hybrid that was totaled

6   in an accident in 2016. Allstate offered to pay, and did pay, $16,870.68 (minus deductible)

7   attributable to the value of the vehicle, citing the CCC valuation report. Plaintiff Olberg was

8   provided the CCC valuation report when Allstate presented its proposed valuation. Days after the

9   accident, Allstate emailed the valuation report to Plaintiff Olberg together with a letter outlining

10  the vehicle valuation and claim settlement offer that was based in part on—and specifically

11  referred Plaintiff Olberg to—CCC's valuation. The CCC valuation report was presented as an

12  authoritative source supporting Allstate's determination of the value. The CCC valuation report

13  $775 to all nine of them without itemizing or explaining the basis of the adjustment as required by

14  Washington law. The report reduced the amount of these comparable vehicles by exactly the same

15  amount, regardless of any individual differences in the condition of the vehicles. These blanket

16  adjustments were arbitrary and unjustified, and they resulted in an underpayment of $775.

17  Plaintiff Olberg was forced to incur additional costs to hire a public adjuster and other out of

18  pocket costs while the payment of his claim was delayed. These additional costs and the

19  substantial delay were a result of Allstate's unlawful valuation practices.

20         59.     The CCC valuation report for Plaintiff Olberg's claim also based its calculations

21  on the value of at least one gray market vehicle instead of a comparable vehicle as required by

22  Washington law: Vehicle No. 3FA6P0LU7DR264686 was manufactured for the Canadian Market

23  in March 2013, was registered in Canada in April 2013, and was imported to the US in September

24  2016. Yet, it was included in the CCC valuation report generated at Allstate's request.

25         60.     The CCC valuation report itself specifies on page 9 that Plaintiff Olberg's

26  wrecked vehicle is not a gray market vehicle. At the same time, the CCC valuation report

27  misstates that the gray market vehicle is comparable to Plaintiff's vehicle and fails to disclose

28  gray market status of the gray market vehicle. The use of a gray market vehicle resulted in an

THIRD AMENDED COMPLAINT - 12
Case No. 18-cv-00573
010743-12/1331903 V1

1   undervaluation to be determined based upon the economic impact of using gray market vehicles

2   for vehicle pricing analysis.

3         61.    In the valuation report, Allstate and CCC state whether the loss vehicle is a gray

4   market vehicle and did in fact determine that Plaintiff Olberg's vehicle was not a gray market

5   vehicle. Nonetheless, CCC's valuation report misstates that the gray market vehicle was

6   comparable to the loss vehicle and never discloses that it is comparing the loss vehicle to a gray

7   market vehicle.

8         62.    Plaintiff Cecilia Ana Palao-Vargas was the owner of a 2011 Hyundai Sonata that

9   was totaled in an accident in 2015. Allstate offered to pay, and did pay, $15,034.93 (minus

10   deductible) attributable to the value of the loss vehicle, citing the CCC valuation report. Plaintiff

11   Palao-Vargas was provided the CCC valuation report when Allstate presented its proposed

12   valuation. Days after the accident, Allstate emailed the valuation report to Plaintiff Palao-Vargas

13   together with a letter outlining the vehicle valuation and claim settlement offer that was based in

14   part on—and specifically referred Plaintiff Palao-Vargas to—CCC's valuation. The CCC

15   valuation report was presented as an authoritative source supporting Allstate's determination of

16   the value. The CCC valuation report listed values of nine different comparable vehicles and

17   applied a uniform condition adjustment of $684 to all nine of them without itemizing or

18   explaining the basis of the adjustment as required by Washington law. CCC's report reduced the

19   amount of each comparable vehicle by exactly the same amount, regardless of individual

20   differences in the condition of the vehicles. These blanket adjustments were arbitrary and

21   unjustified, and they resulted in an underpayment of $684.

22         63.    The CCC valuation report for Plaintiff Palao-Vargas also contained a gray market

23   vehicle. Vehicle No. 5NPEC4AB6BH308719 was manufactured for sale in Canada and was

24   registered in in British Columbia in 2011 where it remained until it was imported to the US in

25   August 2016. Yet CCC listed this vehicle as a purportedly comparable vehicle in the valuation

26   report Allstate tendered to Plaintiff Palao-Vargas instead of relying on comparable vehicles as

27   required by Washington law. The CCC valuation report itself specifies on page 9 that Plaintiff's

28   wrecked vehicle is not a gray market vehicle. At the same time, the valuation report misstates

that the gray market vehicle is comparable to Plaintiff Palao-Vargas's vehicle and fails to disclose the gray market status of the gray market vehicle. CCC's use of a gray market vehicle resulted in an undervaluation to be determined based upon the economic impact of using gray market vehicles for vehicle pricing analysis.

64.     Through the valuation report, Allstate and CCC have the ability to determine whether a vehicle is a gray market vehicle and did in fact determine that Plaintiff Palao-Vargas's vehicle was not a gray market vehicle. Nonetheless, CCC's valuation report misstates that the gray market vehicle was comparable to the loss vehicle and never discloses that it is comparing the loss vehicle to a gray market vehicle.

65.     Plaintiff Michael Clothier was the owner of a 2012 Dodge 1500 Laramie Longhorn that was totaled in an accident in 2016. Allstate initially offered to pay, $22,641.00 (minus deductible) attributable to the value of the loss vehicle, citing the CCC valuation report. Plaintiff Clothier was provided the CCC valuation report when Allstate presented its proposed valuation. Days after the accident, Allstate emailed the valuation report to Plaintiff Clothier together with a letter outlining the vehicle valuation and claim settlement offer that was based in part on—and specifically referred Plaintiff Clothier to—CCC's valuation. The CCC valuation report was presented as an authoritative source supporting Allstate's determination of the value.

66.     All vehicles used to determine the value of Plaintiff Clothier's vehicle in the first valuation report were gray market vehicles:

a)     Vehicle No. 1C6RD7PT4CS295897 was manufactured for sale in Canada, was registered in Canada in October 2011, and was imported to the US in October 2016;

b)     Vehicle No. 1C6RD7PT7CS256642 was manufactured for sale in Canada in 2012 with Canadian specifications including a speedometer denoted in kilometers, was registered in Canada in October 2012, and was imported to the US in August 2016;

c)     Vehicle No. 1C6RD7PT3CS131637 was manufactured for sale in Canada in 2011 with Canadian specifications including a speedometer denoted in



kilometers, was registered in Canada in November 2011, and was imported to the US in June 2016;

d)      Vehicle No. 1C6RD7PTXCS264203 was manufactured for sale in Canada in 2012 with Canadian specifications including a speedometer denoted in kilometers, was registered in Canada in June 2012, and was imported to the US in June 2016.

67.      Upon discovery of the use of gray market vehicles in the valuation of his loss vehicle, Plaintiff Clothier notified Allstate and requested an updated valuation report using non-gray market vehicles. All the comparable vehicles listed in the second CCC valuation report were also gray market vehicles:

a)      Vehicle No. 1C6RD7PT4CS110795 was manufactured for sale in Canada in 2012 with Canadian specifications including a speedometer set to kilometers, was registered in Canada in November 2011, and was imported to the US in August 2016;

b)      Vehicle No. 1C6RD7PT5CS237801 was manufactured for sale in Canada in 2011 with Canadian specifications including a speedometer set to kilometers, was registered in Canada in February 2011, and was imported to the US in September 2016.

68.      Despite being non-comparable, gray market vehicles, CCC included both of these vehicles—along with the previously mentioned gray market Vehicle No. 1C6RD7PT4CS295897—in the second CCC valuation report tendered to Plaintiff Clothier by Allstate. Even though Plaintiff Clothier had identified and complained about the use of gray market vehicles, CCC generated and Allstate produced yet another vehicle valuation report that contained gray market vehicles.

69.      Upon reviewing the second report, Plaintiff Clothier requested a revaluation of his loss vehicle. The third CCC report generated by CCC at Allstate's request still included two vehicles previously identified as gray market vehicles, Vehicle Nos. 1C6RD7PT4CS295897 and 1C6RD7PT5CS237801.



70.     The use of these gray market vehicles to value Plaintiff Clothier's vehicle resulted in undervaluations to be determined based upon the economic impact of using gray market vehicles for vehicle pricing analysis.

71.     It was not until Plaintiff Clothier received his fourth and final CCC valuation report and settlement offer that Allstate offered Plaintiff Clothier a settlement amount that did not rely upon the value of gray market vehicles.

72.     Additionally, each of the CCC valuation reports received by Plaintiff Clothier applied a uniform condition adjustment of approximately $1,700 to all of the comparable vehicles without itemizing or explaining the basis of the adjustment as required by Washington law. The first three CCC valuation reports reduced the amount of each comparable vehicle by exactly $1,719, regardless of individual differences in the condition of the vehicles. The final CCC valuation report adjusted each of the six comparable vehicles by $1,749, regardless of the individual differences in those vehicles. These blanket adjustments were arbitrary and unjustified. As a result of Allstate and CCC's unlawful valuation practices and the need to challenge them, Plaintiff was forced to contest the valuation and the payment of Plaintiff Clothier's claim was delayed by an appraisal process. The appraisal determined that Plaintiff Clothier's vehicle was worth $27,000, nearly 20% more than Allstate's initial offer based on the faulty CCC valuation reports. Allstate based its payment on this appraisal, and Plaintiff Clothier incurred out-of-pocket losses because the payment of his claim was delayed as a result of Allstate and CCC's unlawful valuation practices.

73.     Plaintiff Jacob Thompson was the owner of a 2013 Ford Edge Limited Edition that was total in an accident in 2018. Allstate initially offered to pay $15,609.00 (minus deductible) attributable to the value of the loss vehicle, citing the CCC valuation report. Plaintiff Thompson was provided the CCC valuation report when Allstate presented its proposed valuation. Days after the accident, Allstate emailed the valuation report to Plaintiff Thompson together with a letter outlining the vehicle valuation and claim settlement offer that was based in part on—and specifically referred Plaintiff Thompson to—CCC's valuation. The CCC valuation report was presented as an authoritative source supporting Allstate's determination of the value.

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

74.     The valuation report listed values of twelve different comparable vehicles and applied a uniform condition adjustment of $553 to all twelve of them without itemizing or explaining the basis of the adjustment as required by Washington law. The report reduced the amount of each comparable vehicle by exactly the same amount, regardless of individual differences in the condition of the vehicles. These blanket adjustments were arbitrary and unjustified. Upon discovering that Allstate had grossly undervalued his vehicle, Plaintiff Thompson challenged the valuation and CCC furnished a new report to Allstate. The second report valued Plaintiff Thompson's vehicle at $15,669.00. The updated CCC report also applied an unexplained, unitemized, uniform condition adjustment of $553 to each of the twelve comparable vehicles. Again, Plaintiff Thompson challenged the valuation. The third CCC report listed values of eleven different comparable vehicles, but similar to the previous reports, applied an unexplained, uniform condition adjustment of $528 to each of the comparable vehicles, regardless of individual differences resulting in a valuation of $16,443.00.

75.     As a result of Allstate and CCC's continued unlawful valuation practices and the need to challenge them, Plaintiff was forced to contest the valuation and the payment of Plaintiff Thompson's claim was delayed by an appraisal process. The appraisal determined that Plaintiff Thompson's vehicle was worth $18,200, exceeding Allstate's initial offer based on the faulty CCC valuation reports by more than 15%. Allstate based its payment on this appraisal, and caused out-of-pocket losses to Plaintiff Thompson because Plaintiff Thompson was forced to pay nearly $1,000 to hire a public adjuster, paid additional rental car payments, and incurred other out of pocket costs while the payment of his claim was delayed. These additional costs and the substantial delay were a result of Allstate and CCC's unlawful valuation practices.

76.     Later, Plaintiff Thompson discovered the CCC valuation report for his claim based its calculations on the value of multiple gray market vehicles and not comparable vehicles as required by Washington law: For example, Vehicle No. 2FMDK4KC8DBB96540 was manufactured for sale in Canada in March 2013, was registered in British Columbia, Canada in April 2013, and was imported to the US in July 2017.

77.     The CCC valuation report itself specifies on page 9 that Plaintiff Thompson's

1    wrecked vehicle is not a gray market vehicle. At the same time, the CCC valuation report

2    misstates that the gray market vehicle is comparable to Plaintiff Thompson's vehicle and fails to

3    disclose the gray market status of the gray market vehicle. The use of a gray market vehicle

4    resulted in undervaluations to be determined based upon the economic impact of using gray

5    market vehicles for vehicle pricing analysis.

6         78.    Through the valuation report system, Allstate and CCC have the ability to

7    determine whether a vehicle is a gray market vehicle and did in fact determine that Plaintiff

8    Olberg's vehicle was not a gray market vehicle. Nonetheless, CCC's valuation report misstates

9    that the gray market vehicle was comparable to the loss vehicle and never discloses that it is

10   comparing the loss vehicle to a gray market vehicle.

11        79.    Allstate and CCC systemically rely upon the value of salvage and gray market

12   vehicles to value and/or settle total loss claims.

13        80.    Since 2011, CCC has furnished valuation reports to over 1,000 Allstate insureds

14   in Washington state that list at least one salvage vehicle as a comparable vehicle, even where the

15   loss vehicle is not a salvage vehicle.

16        81.    Since 2011, CCC has furnished valuation reports to over 2,000 Allstate insureds

17   in Washington state that list at least one Canadian gray market vehicle as a comparable vehicle,

18   even where the loss vehicle is not a gray market vehicle.

19        82.    Upon information and belief, Allstate and/or CCC deliberately limit, skew, alter,

20   fabricate, and/or otherwise distort the price data used to value total loss claims, such that the data

21   includes a disproportionate number of prices for salvage vehicles, gray market vehicles, and

22   other vehicles of types that are not comparable to (and inherently worth less than) the loss

23   vehicles of their insureds.

24        83.    Allstate and/or CCC rely upon a flawed algorithm that supplies salvage and gray

25   market vehicles for use in CCC valuation reports and claim settlements without disclosure of the

26   salvage and/or gray market status of those vehicles and without making any countervailing

27   adjustment in favor of the insured.

28

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

84.     Allstate and/or CCC fail to remove salvage and/or gray market vehicle prices from the price data used to value total loss claims.

85.     Allstate and/or CCC fail to take reasonable measures to ensure that the price data used to value total loss claims does not include salvage and/or gray market vehicle prices.

86.     Allstate and CCC have acted with at least reckless disregard of the rights of others by manipulating the numbers to settle total loss claims. Allstate and CCC have devised valuation methods that are unfair, misleading, deliberately inconsistent, and calculated to confuse and deceive consumers and their advocates in the settlement process.

87.     Allstate and CCC's practices have cost consumers tens of millions of dollars in losses as their claims go underpaid. Meanwhile, Allstate and CCC reap millions in wrongful profits by betraying the trust of their consumers.

## VI.     CLASS ACTION ALLEGATIONS

88.     This action is brought and may properly be maintained as a class action, as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23. Plaintiffs bring all claims herein individually and as a class action (for the classes defined below), pursuant to Federal Rule of Civil Procedure 23.

89.     The class consists of two subclasses defined as follows:

> All individuals insured by Allstate under an Allstate private passenger vehicle policy who, from the earliest allowable time to the date of judgement,
>
> (1)     Received a first-party total loss settlement or settlement offer based in whole or in part on the price of one or more salvage or gray market vehicles, where the loss vehicle was not a salvage or gray market vehicle, respectively; or
>
> (2)     Received a first-party total loss settlement or settlement offer based in whole or in part on the price of comparable vehicles reduced by a "condition adjustment."

90.     While the exact number of members cannot be determined, the class consists of at least thousands of persons located throughout the State of Washington. The members of the class



are therefore so numerous that joinder of all members is impracticable. The exact number of class members can readily be determined by documents produced by Allstate.

91.     There are questions of fact and law common to the class, including the following:

i.      Whether Defendants used the values of salvage or gray market vehicles to calculate the values of loss vehicles;

ii.     Whether Defendants' use of salvage or gray market vehicles to calculate the values of loss vehicles was proper;

iii.    Whether Defendants applied condition adjustments to comparable vehicles to calculate the values of loss vehicles;

iv.     Whether Defendants' application of condition adjustments to comparable vehicles to calculate the values of loss vehicles was proper;

v.      Whether, through each of the foregoing practices, Allstate breached its contracts with its insureds;

vi.     Whether, through each of the foregoing practices, Allstate committed a breach of the common law duty of good faith and fair dealing;

vii.    Whether, through each of the foregoing practices, Allstate violated the Insurance Fair Conduct Act, WASH. REV. CODE § 48.30.010 *et seq.*;

viii.   Whether, through each of the foregoing practices, Allstate violated regulations governing unfair claims settlement practices including WASH. ADMIN. CODE § 284-30-330 *et seq.*;

ix.     Whether, through each of the foregoing practices, Defendants violated the Consumer Protection Act, WASH. REV. CODE § 19.86.020;

x.      Whether, through the foregoing practice, CCC negligently supplied information for the guidance of others;

xi.     Whether, through the foregoing practice, CCC and Allstate entered into an unlawful conspiracy;

xii.    Whether Defendants' use of salvage or gray market vehicles caused injury to Plaintiffs and the class;

xiii.   Whether Defendants' use of improper condition adjustments to value loss vehicles caused injury to Plaintiffs and the class;

xiv.    Whether Defendants' actions were unreasonable, frivolous, or unfounded;

xv.     Whether Defendants' actions were reckless, malicious, or willful;

xvi.    Whether Plaintiffs and the class are entitled to an award of compensatory damages;



xvii.   Whether Plaintiffs and the class are entitled to an award of treble damages;

xviii.   Whether Plaintiffs and the class are entitled to an award of attorney's fees;

xix.   Whether Plaintiffs and the class are entitled to declaratory and injunctive relief.

92.     Plaintiffs have the same interests in this matter as all other members of each class, and their claims are typical of those of all members of each class. Plaintiffs' claims are coincident with and not antagonistic to those of other class members they seek to represent. Plaintiffs and all class members have sustained damages arising out of Defendants' common course of conduct as outlined herein. The damages of each class member were caused by Defendants' wrongful conduct.

93.     Plaintiffs are committed to pursuing this action and have retained competent class counsel experienced in insurance litigation and class action litigation. Plaintiffs will fairly and adequately represent the interests of the class members.

94.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because Allstate's actions are generally applicable to the class as a whole, and Plaintiffs seek, inter alia, equitable remedies with respect to the class as a whole.

95.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law and fact enumerated above predominate over questions affecting only individual members of the class, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Plaintiffs' counsel, highly experienced in insurance litigation and class action litigation, foresees little difficulty in the management of this case as a class action.

**FIRST CAUSE OF ACTION**
**(BREACH OF CONTRACT AGAINST ALLSTATE)**

96.     Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

97.     The Allstate insurance contracts specifically provide for payment of the "actual cash value" of a vehicle deemed a total loss as a result of an automobile accident.

98.     Allstate has breached the contracts by not offering to settle and by not settling claims based upon the actual cash value of loss vehicles. Allstate departed from the use of actual cash values by (1) basing its valuation and payment of the claims on values of comparable vehicles that have been artificially reduced by an arbitrary and unjustified "condition adjustment" that is not itemized or explained; and (2) using a flawed algorithm that bases its valuation and payment of the claims upon the prices of salvage or gray market vehicles, where the loss vehicle is not a salvage or gray market vehicle, without disclosure and a countervailing adjustment in favor of the insured.

99.     Allstate's numerous breaches have resulted in a systematic failure to pay the actual cash value of total-loss vehicles as required by contract.

100.    Allstate's breaches and violations have caused damage to Plaintiffs and the class.

## SECOND CAUSE OF ACTION
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALLSTATE)**

101.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

102.    Allstate owed Plaintiffs and class members, as its insureds, a duty of good faith and fair dealing at all times during the existence of the insurance contracts and while providing automobile insurance coverage, including when handling total loss claims for its insureds.

103.    Allstate purposefully, in bad faith, and without regard to the rights of the Plaintiffs and the class, failed to pay the actual cash value of total-loss vehicles. Allstate's actions breached the insurance contracts and were unreasonable, frivolous, and unfounded.

104.    Allstate's unfair acts and/or acts of bad faith include (1) exercising its discretion to select and employ a valuation system that bases valuation and payment of the claim on values of comparable vehicles that have been artificially reduced by an arbitrary and unjustified "condition adjustment" that is not itemized or explained; and (2) exercising its discretion to select and employ a valuation system that bases its valuation and payment of the claim upon the

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

prices of salvage or gray market vehicles, which by definition are not comparable to the loss vehicle and artificially depress the valuation by virtue of their salvage or gray market status; (3) ignoring that their valuation repots are facially non-compliant with the law because they do not itemize adjustments and contain vehicles with salvage and gray market title histories even while confirming that the loss vehicle has no such history.

105.    Allstate breached the covenant of good faith and fair dealing with the aforementioned conduct.

106.    Allstate's breach of the obligation of good faith and fair dealing caused Plaintiffs and class members to incur damages as more fully set forth below.

**THIRD CAUSE OF ACTION**
**(CONSUMER PROTECTION ACT—VIOLATION OF WASH. REV. CODE § 19.86.020 AGAINST ALL DEFENDANTS)**

107.    Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

108.    Allstate and CCC's actions complained of herein are deceptive trade practices that have the capacity to and do deceive consumers, as Defendants unreasonably denied payment of benefits to Plaintiffs and the class and knowingly misrepresented the basis for its total loss valuations. Allstate failed to adopt and implement reasonable standards for the investigation of claims. Allstate failed to conduct a reasonable investigation regarding its claims payments. Allstate further made false representations as to the characteristics and benefits of its total loss coverage and insurance policies and represented that they were of a particular standard, quality, or grade, knowing they were not. CCC intentionally or negligently supplied false and misleading valuation data to Allstate for the guidance of Allstate and their customers in the settlement of total loss claims, knowing the information would be used for this purpose and that the insured would see and rely on data listed in the CCC valuation reports. The CCC valuation reports were false or deceptive because they included condition adjustments to the values of comparable vehicles that were unjustified, arbitrary, unitemized, and unexplained. These adjustments were false or deceptive because they had no basis in fact, and regardless they resulted in a false or deceptive statement of the value of the loss vehicle because they are contrary to Washington law

and should not have been applied. Additionally, the CCC valuation reports were false or deceptive because they included the use of a flawed algorithm that presents salvage or gray market vehicles as comparable vehicles when they are not, without disclosure or adjustment. As described above, salvage and/or gray market vehicles are not true comparable vehicles as required by Washington law. Thus, Allstate's settlement offers were based in part on false valuations provided by CCC that did not reflect the value of the loss vehicle.

109.    Defendants' conduct continues to occur in the course of Defendants' business. Defendants' conduct is part of a generalized course of conduct repeated on thousands of occasions, and thus has an impact on the public interest.

110.    Defendants' conduct is in violation of the Washington Consumer Protection Act, in particular, but not limited to, WASH. REV. CODE § 19.86.020.

111.    As a result of Defendants' actions, Plaintiffs and class members incurred damages as more fully set forth below.

## FOURTH CAUSE OF ACTION
## (CIVIL CONSPIRACY AGAINST ALL DEFENDANTS)

112.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

113.    As alleged above, Allstate knowingly entered into agreements with CCC under which CCC would furnish Allstate with valuation reports that undervalued total loss claims by applying unjustified, unexplained, and unitemized condition adjustments to the values of comparable vehicles. Allstate also entered into agreements with CCC under which CCC would furnish Allstate with valuation reports that undervalued total loss claims by relying upon an algorithm that supplies prices of salvage or gray market vehicles, which are not comparable to loss vehicles that are not salvage or gray market vehicles, without disclosure or a countervailing adjustment in favor of the insured. Allstate is a sophisticated insurance company that conducts due diligence inquiries on major transactions to purchase products and services from third parties. Allstate entered into its contracts with CCC knowing that by doing so, it was incorporating CCC's unlawful valuation methods into its claims handling practices. Allstate



permitted CCC to train Allstate personnel to abide by CCC's valuation recommendations and Defendants dismissed and deflected concerns that the condition adjustments do not comply with Washington law. The use of these valuation reports to process and underpay claims violates Allstate's contracts with their insureds as well as the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020.

114. The agreements between CCC and Allstate constitute an agreement to accomplish a unlawful purposes, to wit, the breach of the insurance contracts. The agreements between CCC and Allstate therefore constitute a civil conspiracy.

115. As a result of Defendants' actions, Plaintiffs and class members incurred damages as more fully set forth below.

### FIFTH CAUSE OF ACTION
### (DECLARATORY AND INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS)

116. Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

117. Plaintiffs bring this cause of action for themselves and the class pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201 seeking a declaration that, for those who maintain an auto insurance policy with Allstate, it is a violation of Washington law and the insurance contracts for Allstate to (1) base its valuation and payment of the claim on values of comparable vehicles that have been artificially reduced by an arbitrary and unjustified "condition adjustment" that is not itemized or explained; and (2) base its valuation and payment of the claim upon values of salvage or gray market vehicles.

118. This court has the power to declare the rights of said Allstate policyholders and those who would be insured under such policies and who may suffer similar losses in the future, as well as those who have suffered valuation-related losses.

119. Plaintiffs, for themselves and on behalf of the class, seek a declaration of their rights under the Allstate policy, and seek a declaration of the rights and liabilities of the parties herein.

120. With respect to Defendants' continuing unlawful practices, Plaintiffs have no



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  plain, speedy, or adequate remedy at law, the interests of the parties favor an injunction, and an

2  injunction is in the public interest. Plaintiffs therefore seek an order permanently enjoining all

3  Defendants from (1) basing their valuation and/or payment of the claim on values of comparable

4  vehicles that have been artificially reduced by an arbitrary and unjustified "condition

5  adjustment" that is not itemized or explained; and (2) basing their valuation and payment of the

6  claim upon values of salvage or gray market vehicles.

## PRAYER FOR RELIEF

8        WHEREFORE, Plaintiffs pray for the following judgment:

9        A.     An Order certifying this action as a class action, including certifying each cause

10  of action under the appropriate subsection of Fed. R. Civ. P. 23;

11        B.     An Order appointing Plaintiffs as class representatives and appointing the

12  undersigned counsel to represent the class;

13        C.     Declaratory and injunctive relief, including an injunction requiring Defendants to

14  cease and desist from (1) basing their valuations and payments of the claims on values of

15  comparable vehicles artificially reduced by an arbitrary and unjustified "condition adjustment"

16  that is not itemized or explained; and (2) basing their valuations and payments of the claims upon

17  values of salvage or gray market vehicles without disclosure and adjustment where the loss

18  vehicle is not a salvage or gray market vehicle;

19        D.     Treble damages under common law and by statute, under WASH. REV. CODE

20  § 19.86.090;

21        D.     Compensatory damages;

22        E.     An award of attorney's fees and costs, as provided by law and/or as would be

23  reasonable from any recovery of monies recovered for or benefits bestowed upon the class; and

24        F.     Such other and further relief as this Court may deem just, equitable, or proper,

25  including a designation that any unclaimed monies may go to the next best use.

## JURY DEMAND

27        Pursuant to Rule Local Rules W.D. Wash. LCR 38, Plaintiffs demand a trial by jury of all

28  of the claims asserted in this complaint so triable.



1

2    Dated: October 19, 2020.          Respectfully submitted,

3                              HAGENS BERMAN SOBOL SHAPIRO LLP

4                              By   */s/ Steve W. Berman*

5                                  Steve W. Berman

Steve W. Berman (WSBA #12536)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Robert B. Carey (*pro hac vice*)
John M. DeStefano (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 224-2628
rob@hbsslaw.com
johnd@hbsslaw.com

Marc A. Goldich (*pro hac vice*)
AXLER GOLDICH LLC
1520 Locust Street, Suite 301
Philadelphia, Pennsylvania 19102
Telephone: (267) 534-7400
mgoldich@axgolaw.com

David Woloshin (*pro hac vice*)
Dina Ronsayro (*pro hac vice*)
ASTOR WEISS KAPLAN & MANDEL LLP
200 South Broad Street, Suite 600
Philadelphia, PA 19102
Telephone: (215) 790-0100
dwoloshin@astorweiss.com
dronsayro@astorweiss.com

Attorneys for Plaintiffs

